**STATE of Missouri, Plaintiff–Respondent,**

v.

**Danny Ray WOLFE, Defendant–Appellant.**

No. SD 27953.

Missouri Court of Appeals, Southern District, Division One.

May 31, 2011.

Application for Transfer Denied June 22, 2011.

Application for Transfer Denied Aug. 30, 2011.

Gary E. Brotherton, Columbia, MO, for Appellant.

Chris Koster, Atty. Gen., Terrence M. Messonnier, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Presiding Judge.

Following a jury trial, Danny Wolfe (Defendant) was convicted of two counts of first-degree murder, two counts of armed criminal action, and one count of first-degree robbery for robbing and killing Leonard and Lena Walters (referred to individually by their first names and collectively as the Walters). *See* §§ 565.020, 571.015, 569.020.[1] Defendant was sentenced to serve three consecutive life sentences without the possibility of parole and 100 years of imprisonment. On appeal, Defendant presents seven points of error. Finding no merit in any of his points, we affirm.

We view the evidence and inferences drawn therefrom in the light most favorable to the verdict. *State v. Schleiermacher*, 924 S.W.2d 269, 272 (Mo. banc 1996); *State v. Williams*, 329 S.W.3d 700, 701 (Mo.App.2010). All contrary evidence and inferences are disregarded. *State v. Mack*, 301 S.W.3d 90, 93 (Mo.App.2010). Viewed from that perspective, the following evidence was adduced at trial.

The Walters, who were married, lived in Greenview, Missouri. In September 1996, they bought a 1990 Cadillac. They parked their older red Cadillac in their front yard with a "for sale" sign in the window. Most mornings, Leonard would go to the Crossroads Coffee Shop. He typically carried as much as $1,000 in cash in his wallet. He would often "flash" his money or discuss it in public, where anyone could see the currency or overhear him talking.

In February 1997, Gregory Addington (Addington) managed a business called Slick's Ozark Bar (Slick's). Defendant was a regular customer. Around the middle of February, Defendant offered to sell Addington a .25 caliber pistol. Addington declined to purchase the weapon. At that time, Defendant had a job painting some of the buildings at the Port Velero condominiums in Camdenton, Missouri. On the afternoon of February 19th, Defendant stopped by the apartment of Christopher Young (Young). Micheal Cauthron, a friend of Young, also was at the apartment. Defendant wanted Young's help on some painting jobs. They agreed to meet the next morning at a cigarette shop they would be painting. Before leaving, Defendant left a briefcase in Young's laundry room. Defendant said he was going out on a date and needed to make room in his pickup truck. Out of curiosity, Cauthron looked inside the bag and saw a wig with black, grey and white hair.

Jessica Cox (Cox) was part of a four-person team that played pool in a league. There were games every Wednesday at different bars. After the competition was over, some of the team members would stay at the bar hosting the competition that evening or return to Slick's, the bar that sponsored Cox's team, for drinks. February 19, 1997, was a Wednesday. That evening, Cox's team was competing at a bar in Eldon, Missouri. After the competition concluded, the team returned to Slick's. Cox's teammates, including her fiance, left before midnight. Cox let her fiancé know that she could get a ride home from somebody. Shortly thereafter, Cox went across the street to the Rock Island

---

1. All references to statutes are to RSMo (2000). All references to rules are to Missouri Court Rules (2009).

bar. While Cox was there, Defendant sat down on an adjoining bar stool and introduced himself. Defendant told Cox that "he would love to have a line[,]" which meant "a drug line of cocaine or meth." Defendant then told Cox that he could "front" her some drugs to sell for him.[2] Cox said she thought she would be able to sell the drugs and make Defendant some money. Defendant told Cox that she would need to go with him to his place to pick up the drugs. Defendant was staying in Room 305 of the Williamsburg Inn. When last call was announced at 1:00 a.m., Cox left the bar with Defendant and rode in his truck to his hotel room. They arrived there around 1:35 a.m. on Thursday morning.

They remained in Defendant's room 15 to 20 minutes and then left to go to Young's apartment in Camdenton. Defendant went to the door and picked up the bag he had left there earlier. Defendant and Cox then returned to Defendant's hotel room. Once there, Defendant removed some handcuffs from the bag. He also changed into a camouflage jacket and some silky nylon "parachute" pants.

At around 4:30 a.m., Defendant and Cox left the hotel. They stopped at a gas station, and Defendant gave Cox some money. He told her to buy sodas and a pair of jersey gloves. They drove to Greenview, where Defendant pointed to the Walters' house and said, "[t]hat's the house we're going to." He drove past the house and parked on a gravel area adjacent to the roadway. It was around 5:00 a.m.

While parked, Defendant said he knew the Walters had a lot of money. They were expecting Defendant early that morning to test-drive the red Cadillac. Defendant said he planned to rob the Wal-

ters. While Cox was with Leonard test-driving the car, Defendant intended to rob Lena. Defendant put on some jersey gloves, pulled some handcuffs out of his pocket and began rubbing them to remove any fingerprints. He gave another pair of jersey gloves to Cox and said she should wear them.

About 6:00 a.m., Defendant and Cox drove to the Walters' house. There were three vehicles parked near the house, facing the roadway. The red Cadillac was parked about 100 feet from Highway 7. Defendant parked his pickup truck behind the Cadillac. He went to the house, and Lena answered the door. She was joined by Leonard, who walked with Defendant to the Cadillac. Defendant told Cox to join them at the car.

Leonard invited Cox to take the car for a test drive. She asked Leonard to accompany her so he could explain the car's features and any problems with it. Cox got into the driver's seat, and Leonard sat in the front passenger seat. Defendant got into the back seat. Cox then described what happened during the test drive:

> As we're turning around and got back up on 7 highway and headed back to the Walters', probably a quarter of the way back, I heard a loud bang in the vehicle and I looked over and I saw, I heard [Leonard] take his last breath and tilt his head down, and at that moment I saw something coming from the back of his head, and like, and like I can't see exactly what it was but I could see the end that stuck out of the hand. It looked like a barrel of a gun.

As Cox was driving back to the Walters' home, Defendant checked Leonard's pockets. Defendant located Leonard's wallet,

---

**2.** According to Cox, to front "means that you get the drugs but you don't have to pay for them firsthand ... you'd go out and sell them and bring back the money or what you owe[.]"

which was full of cash, and said, "this guy is loaded."

When they got back to the Walters' residence, Defendant told Cox to park the Cadillac and to get back into Defendant's vehicle. Defendant went inside the Walters' home without knocking. He was gone for seven or eight minutes. Cox heard a loud "commotion" that sounded like somebody had knocked heavy boxes on the floor, followed by a shot and more noises from the house. Defendant exited the house carrying a safe. He placed the safe, which was heavy and approximately two feet square, in the bed of his truck.

Defendant drove his truck onto Highway 7 and headed toward Greenview. When he reached Greenview, he turned onto EE Highway. He stopped the truck on the side of the road in a wooded area with a hill to the left and a slope to the right. Defendant carried the safe and a toolbox down the slope and into the woods on the right side of the truck. Cox saw Defendant using tools to open the safe. Once Defendant got the safe open, he started taking out papers and looking through them. After examining the items, he threw some onto the ground beside him. Defendant kept other items and stuffed them in his pockets. Defendant returned to the truck, leaving behind the safe.

Defendant then drove to the Port Velero condominiums. He said he had to check out a job and dispose of a gun. Defendant stopped at one location to check on the job, but he did not have a key. He and Cox drove to the condominium where the complex's custodian lived. Defendant asked for the key to the storage shed so he could get some material out of it for a job. The custodian observed that Defendant was wearing silky nylon pants made of a parachute-like material. Defendant and Cox drove back to the first location. Defendant got out of his truck and was gone for five to ten minutes. When Defendant returned, he was wearing white painter's pants and a sweatshirt. As he got into the truck, he told Cox that she had nothing to worry about now because he had thrown the gun into the lake. Around 8:00 a.m., Defendant and Cox arrived at a shopping center on Highway 5 near Camdenton. Defendant picked up some paint at a store. Cox then asked Defendant to drop her off at the Osage Beach Hospital. Cox intended to tell people that she had been kidnapped and escaped. Defendant drove Cox to the hospital and gave her $540 in cash. Defendant warned Cox that he would kill her, her relatives and everybody she knew if she told anyone what had happened. After being dropped off, Cox contacted some of her friends. She told them that she had been kidnapped and had reported the incident to police.

That same morning, Young had gone to the parking lot of the cigarette shop where he had arranged to meet Defendant. Young arrived between 7:00 and 8:00 a.m. He waited an hour and then left because Defendant did not show up.

Some time after Addington had the conversation with Defendant about selling the .25 caliber gun, Defendant returned to Slick's with some coins that he wanted to exchange for bills. The coins, all quarters, "were in some sort of bags." Defendant exchanged $25 in quarters for bills.

In February 1997, Kenneth Stoller was employed as a propane gas deliveryman. His route included the town of Greenview. On several prior occasions, he had driven past the Walters' residence and had seen the red Cadillac that was for sale. He had never seen anyone in or around the Cadillac as he drove past. At approximately 8:30 a.m. on the 20th, Stoller drove past the Walters' residence. He saw a man sitting in the front passenger seat of the Cadillac. At approximately 10:30 a.m., Stoller drove past the Walters' residence

going the opposite direction. He again saw a man sitting in the front passenger seat of the Cadillac. Stoller thought this was peculiar because the man had not moved during that two-hour interval.

In February 1997, Charles Lunaberg was employed as a contract mail carrier to deliver mail every day except Sunday. His route included the Walters' residence. He had been the Walters' mailman since 1988. Lunaberg delivered the Walters' mail by placing it in their mailbox on Highway 7. Lunaberg usually did so between 1:30 p.m. and 3:30 p.m. The Walters had a habit of picking up their mail every day. Their mailbox was always empty when Lunaberg made the next day's delivery. The Walters' mail delivery included the daily Lake Sun newspaper. When Lunaberg delivered the mail on Thursday the 20th, he noticed that the Walters had not picked up the mail delivered to them on Wednesday. Lunaberg noticed the same thing when he delivered the mail on Friday the 21st. He thought this was unusual because the Walters "were people that always got their mail out of the box."

On Sunday, February 23rd, Charles Rickey made two trips to the Walters' property to dump septic tank waste on their field. Rickey had an agreement with Leonard to pay him $5 for each load of material dumped on the Walters' property. Rickey dumped the first load around 8:00 a.m. that morning. On the second trip, Rickey was accompanied by his father. Rickey dumped the second load around noon. As he was leaving, he saw Leonard sitting on the passenger side of the red Cadillac. Rickey walked up to the vehicle and noticed dried blood on Leonard's clothing. Rickey opened the door and touched Leonard, who "felt like he was all like concrete." Rickey called 911. His father went to the door of the Walters' residence and yelled for Lena. There was no response.

Several firemen and an EMT responded to Rickey's 911 call. Fireman Michael Oakes looked inside the red Cadillac and observed a small caliber spent shell casing on Leonard's collar, as well as one or two more shells in the back seat. The first responders were joined by Corporal Rod Sederwall, on off-duty member of the Missouri State Water Patrol. He saw the spent shell casing on Leonard's collar and what looked like a live .25 caliber round in the back seat.

Shortly afterwards, Deputy David Edwards of the Camden County Sheriff's Department arrived. After learning that Leonard was dead of an apparent gunshot wound, Deputy Edwards became concerned because no one had seen or talked to Lena. He and Corporal Sederwall entered the Walters' house to check on Lena. There was no response when the officers knocked on the front door and announced their presence. They entered through the unlocked front door. There was a knife, a pair of glasses and tennis-shoe type footprints on the kitchen floor. Deputy Edwards found Lena in a hallway. Her body was cold and stiff. There was blood all over her clothing and on the floor around her. A shotgun was lying near her feet. After quickly checking other rooms to make sure no one else was in the house, Deputy Edwards and Corporal Sederwall left. Deputy Edwards secured the scene until his supervisor arrived.

Other law enforcement officers and personnel began to arrive around 1:15 p.m. to assist in the investigation. In one room of the house, police found a hidden safe containing almost $17,000 in cash. Another $4,300 in cash was found in Leonard's underwear drawer. A bloody knife and linoleum with shoeprints on it were removed from the kitchen. The pattern on those shoeprints did not match the shoes that Lena was wearing. One bedroom in the

house was in disarray. Ammunition had been dumped on the bed, and there was a shotgun on the floor. The weapon contained one expended shotgun shell, and there was another expended shell on the floor. The Walters used firewood to heat their home. There was a wood-burning stove in the corner of the living room. A detective touched the stove and determined that it was cold. The interior of the Walters' home was cold and felt like it had been without heat for several days.

Dr. James Jungels (Dr. Jungels), the Camden County coroner, examined and photographed the bodies. Lena was lying facedown on the floor. The livor mortis in the body indicated that it had not been moved. Dr. Jungels smelled the odor of putrefying flesh. That indicated bacteria were eating the flesh and producing odorous gas and liquid. Her skin was loose and getting ready to slough off. Lena had a cut on her face and apparent stab wounds to her chest. When Dr. Jungels opened the door of the red Cadillac, he smelled the odor of putrefaction. The skin on Leonard's body was loose and sloughing off. Dr. Jungels sent the bodies to Dr. Jay Dix (Dr. Dix) to have autopsies performed.

On Monday the 24th, Dr. Dix performed autopsies on the bodies of Leonard and Lena. Dr. Dix determined that: (1) Leonard died from a gunshot wound to the head that perforated his spinal cord; and (2) Lena died from an abdominal stab wound that penetrated her heart. Lena also had a shotgun wound above her left breast. Dr. Dix recovered a bullet fragment from Leonard's body and a shotgun wad and pellets from Lena's body. Leonard's body showed some decompositional changes, including skin slippage, green discoloration of the skin and a marbling effect caused by the breakdown of blood within the blood vessels. Dr. Dix testified that, "[a]fter a

person has been dead for awhile, lots of things happen to the body. The skin changes color, the outside of the skin begins to slip off, as well as the body starts to swell up." The only sign of decomposition in Lena's body was a green discoloration of her abdominal area. The temperature of the surrounding area in which the person died is the most important factor affecting the rate of decomposition. Dr. Dix saw nothing during his examination of the Walters' bodies that would be inconsistent with them being killed on the morning of Thursday the 20th.

At 3:45 p.m. on Monday the 24th, an officer with the Osage Beach Police Department was sent to the Walters' residence to recover mail from their mailbox. This mail included: (1) a letter to Lena from the Camdenton Medical Center postmarked on February 20th; (2) a bank statement postmarked February 19th; (3) a Bison newspaper that had been printed on February 19th; (4) a Lake Sun newspaper printed on February 20th; and (5) a Lake Sun newspaper bearing the date of February 22nd.

Approximately one week after the Walters had been killed, Cox's friends discovered that her kidnapping story was a lie. On February 27th, Cox decided to talk to an attorney. After that meeting, the attorney called the Camden County prosecutor and worked out an agreement. Cox was given immunity from prosecution in exchange for her truthful testimony about what had happened. Around 5:00 p.m. that evening, Cox took two Camden County deputies to the place where Defendant had left the Walters' safe. Once there, one of the officers found the safe. There was a bag of quarters inside the safe. Approximately $40 in loose quarters was scattered up and down the slope of the hill, along with papers bearing Leonard's name.[3] Cox then took the deputies to the

---

3. A key to the safe was later recovered from Lena's purse.

Port Velero condominiums and described what Defendant had done there after the Walters were killed.

Thereafter, officers searched for evidence at the Williamsburg Inn. In Defendant's room, police found a pair of handcuffs and a briefcase. In a dumpster at the inn, police found several items. These included: (1) a lock box; (2) a live .25 caliber round with an indentation on the primer from a misfire; (3) a lease agreement for Room 305 bearing Defendant's name for February 11th through March 10th; (4) a synthetic black, white and grey wig, and grey beard; (5) a camouflage coat; (6) some gloves; (7) a partially full box of Winchester .25 caliber ammunition with a black hair inside of it; (8) a box of Norma .25 caliber ammunition; (9) a pistol magazine with an incorrectly loaded .22 caliber round sticking up out of it; and (10) some loose .22 caliber ammunition of the same brand as the one sticking out of the magazine. Officers also searched a locked shed where the paint and canvas for the condominium complex were stored. Defendant had permission to store items inside the shed, but he did not have his own key. Officers recovered some black nylon pants and pair of tennis shoes from the shed. Later laboratory analysis showed that the shoeprints found on the Walters' linoleum were consistent with the tennis shoes found in the shed. During a search of Defendant's truck, officers found some brown jersey gloves.

Defendant was arrested and interviewed by police. Initially, Defendant denied that he knew Cox. Later in the interview, Defendant admitted that Cox went with Defendant to Young's apartment. Defendant also admitted that he and Cox went back to Defendant's room at the Williamsburg Inn. Defendant denied that he took Cox to Port Velero. Police asked Defendant whether they would find the .25 caliber gun in the lake. Defendant said, "[i]f you all can find a gun in the lake his hat's off to us."

Thereafter, Defendant was charged as prior and persistent offender with two counts of first-degree murder, two counts of armed criminal action and first-degree robbery. His first trial ended in convictions on all counts, but that judgment was vacated in a post-conviction proceeding. Defendant was retried in 2006 and again found guilty on all counts. This appeal followed. Additional facts will be set forth as necessary to address each of Defendant's seven points on appeal.

### Point I

In Defendant's first point, he contends the trial court erred by overruling Defendant's motion to quash two search warrants. The following additional facts are relevant to this point.

At the crime scene, Dr. Jungels told officers that he estimated the Walters had been killed sometime between Friday night and Saturday morning. Dr. Jungels, however, was not an expert in determining time of death and agreed that "some of the other cops could have done just as good as I did." Dr. Jungels' estimate was based upon the dried blood, the odor and the amount of rigor mortis in the bodies. The appearance and disappearance of rigor mortis in an average-sized person generally takes about 48 hours, but "a lot of things affect it." One of those is the ambient temperature. Dr. Jungels did not collect any information about the temperature at the scene.

On February 27th, Cox was interviewed by Deputy Gary Bowling (Deputy Bowling) and Deputy Michael Schmidt of the Camden County Sheriff's Office. Deputy Bowling had prior contact with Cox in 1987 when, as a 12–year–old juvenile, she made a false report to police. After Cox was interviewed, officers found the Walters'

safe and papers bearing Leonard's name at the location described by Cox.

Deputy Bowling then applied for warrants to search Defendant's hotel room, vehicle and certain sheds at the Port Velero condominiums. In relevant part, the application stated:

10. On February 27, 1997 Lt. Gary Bowling and Deputy Michael Schmidt conducted an interview with Jessica A. Cox, a 23 year old female. Cox related that she was present with the Defendant at the time Leonard and Lena Walters were killed. Cox stated that she met the defendant, Daniel Wolfe at a bar in Lake Ozark, MO. the morning hours of February 20 and left the bar and went with Wolfe to a motel in Osage Beach. She later left with Wolfe and they drove in Wolfe's vehicle to Greenview, Mo. On the way to Greenview, Wolfe stated to Cox that he was going to commit a robbery near Greenview.

11. Near dawn on February 20th, Wolfe and Cox drove to the Walters residence. Wolfe went to the door of the residence, knocked on the door and was let into the house. After a few minutes Wolfe came out of the house along with Leonard Walters. Leonard Walters got in the front passenger side of a Red Cadillac that Walters was selling. Cox got in the driver's seat and Wolfe got in the back seat of the vehicle behind Walters.

12. Cox drove the Cadillac South on Highway 7. While she was driving the vehicle she heard a loud bang and turned to see Wolfe holding a handgun at the back of Walters' head. She then saw Wolfe remove a wallet from Leonard Walters' overalls.

13. Cox was instructed by Wolfe to drive back to the residence, park the Cadillac in the driveway of the residence, and get in Wolfe's truck and wait. She parked the Cadillac as instructed and got in Wolfe's truck. Cox saw Wolfe run into the Walters' residence. She heard loud noises coming from inside the house and then heard a gunshot from inside the residence. She then saw Wolfe coming from the residence carrying a metal safe. Wolfe put the safe in the back of his pickup truck.

14. Wolfe drove the pickup truck to a location just off State Road EE where Cox watched Wolfe remove the safe from the truck and carry it to a wooded area. Wolfe returned to the truck a short time later.

15. Cox then says Wolfe drove from State Route EE to the Port Valero Condominiums located on Lake Road 5–47G. When they arrived at the Port Valero Condominiums Cox saw Wolfe get out of the truck and walk to a condominium unit, return with a key, then backed his pickup up to another condominium building. He returned wearing painters clothing and made a statement that he threw the gun in the lake.

16. After interviewing Cox, Deputy Schmidt and Lt. Bowling were led to the location off State Highway EE where she saw Wolfe carry the safe over the hill. Deputy Schmidt then located an area scattered with papers containing the name of Leonard Walters and also located a safe.

After the warrants were issued, police searched Defendant's hotel room, vehicle and the storage shed at the Port Velero condominium complex.[4]

---

4. Police also conducted a warrantless search of the dumpster at the Williamsburg Inn. Because Defendant had no reasonable expectation of privacy as to discarded property, no further discussion of this search is required. *See State v. Immekus*, 28 S.W.3d 421, 429 (Mo.App.2000).

In March 2006, Defense counsel filed a motion to quash the search warrants on the ground that the State failed to include seven relevant facts in the affidavit supporting the warrant application. Counsel alleged that these facts were omitted with the intent to make the affidavit misleading and that the affidavit would not have demonstrated probable cause for the searches if these additional facts had been included.

In April 2006, the court held a hearing on the motion. Deputy Bowling testified that he applied for the above-mentioned warrants on February 27th and 28th. Deputy Bowling acknowledged that he had contact with Cox 19 years earlier when she filed a false report with police as a juvenile. The warrant applications did not refer to the 1987 incident, Cox's immunity agreement or the initial false story that she told her friends. Deputy Bowling also had information that, during the course of the investigation into the Walters' murders, other officers had interviewed witnesses who claimed to have seen the Walters alive after the time of death reported by Cox. The trial court denied the motion to quash the search warrants.

*State v. Neher*, 213 S.W.3d 44 (Mo. banc 2007), contains the following summary of the applicable law governing the issuance of a search warrant:

> The Fourth Amendment to the United States Constitution guarantees that no warrant shall issue except upon probable cause supported by oath or affirmation. A neutral magistrate or judge must determine probable cause from the totality of the circumstances. In determining whether probable cause exists, the issuing magistrate or judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her] ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." The presence of such contraband or evidence need not be established at a *prima facie* level, by a preponderance of the evidence or beyond a reasonable doubt.

*Id.* at 48–49 (citations omitted). Defendant does not argue that the search warrant application, as written, was insufficient to prove probable cause. Instead, Defendant argues that there was no probable cause to issue the warrants if we review the search warrant application as written and as supplemented by additional facts that Defendant claims were wrongfully omitted. According to Defendant, the following material facts were omitted from Deputy Bowling's search warrant application: (1) Cox had previously made false statements to police and lied to her friends about what had happened; (2) Cox received immunity from prosecution; (3) Cox kept proceeds from the robbery; (4) other witnesses claimed to have seen the Walters alive after date of death reported by Cox; and (5) Dr. Jungels estimated that the Walters had died later than the date given by Cox.

In order to successfully attack a search warrant on the basis that material facts were omitted from the affidavit, a defendant "must show that (1) the facts were omitted with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading and (2) if the affidavit were supplemented with the omitted facts, the affidavit would not have been sufficient to establish probable cause." *State v. Dawson*, 985 S.W.2d 941, 950 (Mo.App.1999). In our view, Defendant has failed to meet either prong of this test.

The information obtained by police from Cox was based upon personal knowledge that she gained as an accomplice to the crime. Her admission of involvement in the murders and robbery carried its own indicia of reliability and was sufficient to

establish probable cause for the issuance of the search warrants. *See State v. Henry,* 292 S.W.3d 358, 367 (Mo.App.2009); *State v. Erwin,* 789 S.W.2d 509, 511 (Mo. App.1990) (noting that people do not lightly admit a crime and place critical evidence in the hands of police via their own admissions). Moreover, Cox's account of events was corroborated by the discovery of the safe and Leonard's personal papers at the location she described to police, which further established Cox's reliability. *See State v. Rohrer,* 589 S.W.2d 121, 126 (Mo. App.1979). The information supplied by Cox was sufficient to give a neutral magistrate or judge reason to believe there was a fair probability that evidence of a crime would be found in the locations described by her to police.

■ Defendant's list of "omitted" facts amount to nothing more than a general attack on the reliability of the information Cox provided to police. Any such concerns about Cox's credibility, however, were alleviated by the fact that police found physical evidence relating to the crime at a location described by Cox in her interview prior to the warrants being issued. Deputy Bowling's failure to mention the immunity agreement did not make his affidavit misleading. *See State v. Weide,* 812 S.W.2d 866, 870–71 (Mo.App.1991). The same is true of the officer's decision not to include Dr. Jungels' estimate about the time of death or the statements of witnesses who claimed to have seen the Walters alive after the 20th. By Dr. Jungel's own admission, he had no expertise in determining the time of death. The statement of witnesses who claimed to have seen the Walters alive after the 20th was contradicted by circumstantial physical evidence like the uncollected mail in the Walters' mailbox and the dates on those items. Under these circumstances, it was reasonable for Deputy Bowling to rely upon Cox's detailed, corroborated account of what she had observed and where relevant

evidence might be located for the purpose of seeking the search warrant.

In sum, we are not persuaded that Deputy Bowling omitted material facts from his affidavit with the intent of making that document misleading. Neither are we persuaded that the inclusion of such omitted facts in his affidavit would have shown that police had no probable cause to conduct the searches that ensued. *See Dawson,* 985 S.W.2d at 950. Accordingly, the trial court did not err in denying Defendant's motion to quash the search warrants. Point I is denied.

## Point II

■ Defendant's second point contends the trial court erred in denying Defendant's motion for judgment of acquittal because the State did not prove beyond a reasonable doubt that Defendant killed the Walters. The following additional evidence is relevant to this point.

At trial, the jurors were provided with five estimates about when the Walters were killed. Dr. Jungels estimated that the Walters had been killed 24 to 36 hours before they were discovered, but he explicitly disclaimed any expertise in making time of death determinations. Dr. Michael Zaricor (Dr. Zaricor) estimated the Walters' time of death to have been between 36 hours to one week prior to the discovery of their bodies. Dr. Thomas Bennett (Dr. Bennett) opined that the Walters were likely killed either on February 20th or 21st. Dr. Dix saw nothing during his examination of the Walters' bodies that would be inconsistent with them being killed on the morning of February 20th. Defendant's expert, Dr. Samuel Gulino (Dr. Gulino), estimated the Walters' time of death to have been between 24 and 36 hours before their bodies were discovered. He thought it very unlikely that the Wal-

ters had died more than 48 hours before they were found.

Defendant contends that: (1) Dr. Gulino's testimony established to a scientific certainty that the Walters were killed at 1:00 a.m. on February 21st; and (2) in the face of such evidence, no rational juror could find that Defendant killed the Walters at 6:00 a.m. on February 20th as the State theorized. Defendant asserts that "[w]hile the State offered testimony from Cox that pointed the finger at [Defendant], to accept that testimony required the jury to invent a factual scenario that wholly ignored the facts and scientific reality." According to Defendant, "[t]he facts and inferences all lead to the impossibility of Cox's tale." We disagree.

On appellate review, this Court must determine whether there was sufficient evidence to permit a reasonable juror to find guilt beyond a reasonable doubt. *State v. Belton,* 153 S.W.3d 307, 309 (Mo. banc 2005). We view the evidence and all reasonable inferences derived therefrom in a light most favorable to the verdict and disregard any contrary evidence and inferences. *State v. Goodin,* 248 S.W.3d 127, 129 (Mo.App.2008).

■ We have already recited the favorable evidence and inferences supporting the jury's verdicts. Based upon our review of the record, the State made a submissible case on the charges of first-degree murder, armed criminal action and first-degree robbery. An appellate court does not act as a super juror with veto powers; instead, the decision made by the trier of fact is given great deference. *State v. Bateman,* 318 S.W.3d 681, 687 (Mo. banc 2010). Defendant is asking this Court to ignore the applicable standard of review and decide that Cox's testimony was not credible because it conflicted with Dr. Gulino's opinion as to when the Walters were killed. That is not our function. "Reliability and credibility are issues for

the jury." *State v. Miller,* 139 S.W.3d 632, 635 (Mo.App.2004). The jurors can "believe all, some, or none of any witness's testimony in arriving at its verdict." *State v. Pullum,* 281 S.W.3d 912, 915 (Mo.App. 2009). Dr. Gulino's expert opinion conflicted with Cox's eyewitness account of when the Walters were killed, as well as other circumstantial evidence and expert opinions tending to prove that the Walters could have been killed on February 20th. The jury could have found that Dr. Gulino's expert testimony was not credible. *See State v. Johnson,* 244 S.W.3d 144, 155–56 (Mo. banc 2008); *Smith v. State,* 148 S.W.3d 330, 336 (Mo.App.2004). Therefore, the trial court did not err in denying Defendant's motion for judgment of acquittal. Point II is denied.

### *Point III*

■ In Defendant's third point, he contends the trial court abused its discretion in allowing the State to present evidence about an ammunition magazine that was contrary to the facts disclosed during discovery. The following additional facts are relevant to this point.

During a search of the dumpster at the Williamsburg Inn, police found a pistol magazine in a trash bag. Water Patrol Officer Eric Gottman (Officer Gottman) recovered the item. The magazine was lying on top of loose .22 caliber cartridges and had a .22 cartridge sticking straight up out of the magazine. It was listed as a .22 caliber magazine on the evidence form. During discovery, the evidence form and the magazine were provided to defense counsel and their firearms expert for their examination.

About two weeks prior to trial, a prosecutor visually inspected the magazine and concluded that it was for a .25 caliber weapon, rather than a .22 caliber weapon. During the cross-examination of Sgt. Teri

Harmon, who was in charge of the Camden County evidence room, defense counsel asked whether the evidence form stated that a .22 caliber magazine had been found during the dumpster search. During a side-bar at the bench, the prosecutor said he believed the form was in error and the magazine was actually for a .25 caliber weapon. Defense counsel claimed there had been a discovery violation. The court decided to take the issue up later, and Sgt. Harmon was allowed to testify about what the evidence form stated.

During a break in proceedings, defense counsel filed a motion asking the court to prohibit Officer Gottman or any other witness from stating that the magazine was for a .25 caliber weapon. The motion asserted that there had been a discovery violation concerning the magazine. The prosecutor denied there had been a discovery violation because the evidence form and the magazine had been provided to the defense during discovery. The trial court denied the motion because "the magazine is whatever it may be and [Officer Gottman] may not be able to identify it even if he does see it."

During Officer Gottman's testimony, he described the items he found during his search of the dumpster at the Williamsburg Inn. One of those items was the pistol magazine. Because the magazine was lying on top of loose .22 caliber rounds and had a .22 caliber cartridge sticking up out of it, Officer Gottman assumed it was a .22 caliber magazine and listed it that way on the evidence form. He had never tried to load a .22 caliber cartridge in the magazine. When he tried to do so in court, the .22 caliber cartridge would not fit because it was too long for the magazine. He was able to properly load a .25 cartridge in the magazine. Officer Gottman testified that he had made a mistake in describing the magazine on the evidence form. Defense counsel cross-examined Officer Gottman about the mistake at length and impeached him with prior sworn testimony in which he had described the item as a .22 caliber magazine. The tenor of the cross-examination was that Officer Gottman had been sloppy in handling the evidence and that he had previously given unreliable testimony while under oath. During the subsequent testimony of the State's firearms expert, the court prohibited the prosecutor from asking that witness what caliber cartridge the magazine was designed to hold.

During Defendant's case, he presented evidence that the hair found in the box of .25 caliber ammunition, which was recovered from the dumpster, belonged to Cox. In closing argument, defense counsel suggested the bag containing those items had been placed in the dumpster by Cox, rather than Defendant.

On appeal, Defendant contends the court erred in denying the motion to exclude evidence based upon a discovery violation. Citing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Defendant argues that his due process rights to obtain evidence were violated. Defendant claims the admission of this evidence prejudiced him because the State was permitted to make a "wholesale change" in its theory of the case and draw a line between Defendant and the murder weapon. We disagree.

Upon written request, Rule 25.03 requires the disclosure to defense counsel of "books, papers, documents, photographs, or objects" which the State intends to introduce at trial. Rule 25.03(A)(6). The opinions, theories or conclusions of counsel for the State, however, are not subject to disclosure. Rule 25.10(A). The sanction to be imposed for a violation of Rule 25.03 lies within the discretion of the court. *State v. Rousan*, 961 S.W.2d 831, 843 (Mo. banc 1998).

The trial judge concluded that there was no discovery violation here. That ruling was not an abuse of discretion. The defense was provided with the evidence form and the magazine during discovery. Counsel had the opportunity to have the magazine examined by their firearms expert. The prosecutor discovered the misidentification in the evidence form by visually inspecting the magazine itself, which defense counsel had the same opportunity to do. The prosecutor's mental impressions and conclusions about the meaning and significance of the magazine were not subject to disclosure. Rule 25.10(A); *State v. Crespo,* 664 S.W.2d 548, 553 (Mo. App.1983) (where the State provided defense with a copy of a criminalist's report, there was no discovery violation; the prosecutor was not required to disclose his own conclusion that the results of the test appeared to be inaccurate). Neither was there a *Brady* due process violation. *See Gill v. State,* 300 S.W.3d 225, 231 (Mo. banc 2009). Defense counsel were provided with the magazine during discovery, which gave them the same means as the State to discover what caliber weapon the magazine fit.

■ Assuming *arguendo* that there was a discovery violation, Defendant still is not entitled to relief. We review the denial of a requested sanction for abuse of discretion. *Rousan,* 961 S.W.2d at 843.

A trial court's denial of a requested sanction is an abuse of discretion only where the admission of the evidence results in fundamental unfairness to the defendant. Fundamental unfairness exists where there is a reasonable likelihood that the failure to disclose the evidence affected the result of the trial. *Id.* (citations omitted). Here, the admission of Officer Gottman's testimony did not result in fundamental unfairness to Defendant. No murder weapon was ever recovered. The State relied upon circumstantial evidence suggesting that a .25 caliber weapon was used to kill Leonard. The items recovered from the dumpster included a mix of both .22 caliber and .25 caliber ammunition. Defense counsel presented evidence that a hair found inside one of the boxes of .25 caliber ammunition belonged to Cox. During closing arguments, defense counsel argued that it was Cox who placed the discarded materials in the dumpster. During Officer Gottman's testimony, he admitted he made a mistake in describing the magazine. That change in testimony resulted in substantial cross-examination as to the thoroughness of his evidence collection, and the witness was repeatedly impeached with his own prior inconsistent sworn testimony.

After reviewing the record, we are unpersuaded that the admission of this evidence allowed the State to make a wholesale change in its theory, as claimed by Defendant. We also are unpersuaded that this evidence allowed the State to "draw a line" between Defendant and the murder weapon. Addington testified that Defendant offered to sell a .25 caliber pistol in the middle of February, which tended to prove that Defendant had access to such a weapon. Defense counsel admitted that Defendant was staying at the Williamsburg Inn, where the .25 caliber ammunition was found in the dumpster. During interrogation, police asked Defendant whether they would find the .25 caliber gun in the lake. Defendant said, "[i]f you all can find a gun in the lake his hat's off to us." This evidence, which came from sources completely independent of Officer Gottman, tended to connect Defendant to a .25 caliber weapon. Point III is denied.

*Point IV*

■ In Defendant's fourth point, he contends the trial court erred by allowing the State to introduce the hearsay opinions and conclusions of Dr. Bennett, who was

not available to testify, during the testimony of Dr. Zaricor. The following facts are relevant to this point.

Dr. Zaricor was a pathologist called by the State. He had reviewed a number of materials prior to forming his opinions, including testimony given by Dr. Bennett during a prior proceeding. Dr. Zaricor testified that he and Dr. Bennett agreed on the Walters' cause of death. Dr. Zaricor had reviewed Dr. Bennett's testimony, in which he opined that the Walters had been killed on either February 20th or 21st. Dr. Zaricor used Dr. Bennett's testimony in reaching his own conclusions about the Walters' time of death. Dr. Zaricor opined that the Walters had been dead between 36 hours and one week before their bodies were discovered. All of this testimony was given without objection.

■ A specific objection to evidence at the time it is offered is required to preserve the issue for appellate review. *State v. Collins*, 72 S.W.3d 188, 194 (Mo.App. 2002). Because no hearsay objection was asserted during Dr. Zaricor's testimony, this point is not preserved. *See id.* Assuming *arguendo* that hearsay opinions of Dr. Bennett were admitted during Dr. Zaricor's testimony, Defendant is not entitled to plain error relief pursuant to Rule 30.20. Two of the references to Dr. Bennett's opinions involved the issue of the Walters' cause of death, which was not disputed at trial. The third reference involved Dr. Bennett's opinion as to time of death. That opinion was cumulative of Cox's testimony that the Walters were killed on February 20th and expert opinions of Dr. Zaricor and Dr. Dix that the Walters could have been killed on that date. "An allegedly wrongful admission of hearsay testimony does not constitute plain error if such testimony is merely cumulative to other evidence properly admitted." *State v. Goodwin*, 43 S.W.3d 805, 818 (Mo. banc 2001). Point IV is denied.

*Point V*

■ Defendant's fifth point contends the trial court abused its discretion by precluding Defendant from reading the prior testimony of Roger Patterson (Patterson). On March 27, 2001, Patterson was deposed during Defendant's civil post-conviction proceeding. Patterson died on September 19, 2001. At trial, Defendant offered Patterson's deposition from the post-conviction proceeding. The trial court excluded the deposition, and Defendant filed written offers of proof. Defendant argues that trial court's ruling deprived him of his right to present a defense because Patterson's testimony would have explained how Cox's story evolved and impeached Cox's testimony that she had no money trouble at the time of the robbery and murders.

We review whether or not the trial court erred in excluding evidence for abuse of discretion. *State v. Williams*, 97 S.W.3d 462, 468 (Mo. banc 2003). A trial court abuses its discretion in excluding evidence if its decision shocks the sense of justice or indicates an absence of careful consideration. *Lewis v. State*, 152 S.W.3d 325, 330 (Mo.App.2004). A trial court does not abuse its discretion to exclude evidence if the excluded evidence is merely cumulative to other evidence in the record. *State v. Mason*, 95 S.W.3d 206, 211 (Mo.App.2003).

In Defendant's brief, he set out the information he sought to use from Patterson's deposition:

Patterson knew Cox in February 1997. Indeed, he had known Cox for about a year and a half. He met Cox through her then-boyfriend Alan Fair. During February 1997, Cox and Fair were "always" having money problems. They could not afford even to fix their cars. Fair often borrowed money from people; "he was always in arrears to somebody."

On Thursday, February 20, 1997, Cox called Patterson between 7:00 and 7:30 a.m., asking him to pick her up from a local hospital. He picked her up sometime before 9:00 a.m., along with a mutual friend, Scott Gift. Cox told Patterson that she had met a guy at a bar the night before and had left the bar with him. That man "ended up tying her hand, cuffing her in the truck, and taking her to a trailer ..." She said the man tried to rape her. They made a couple stops during which the man went in a trailer with a briefcase and returned to his truck with a briefcase. While the man "went next door to get his friends", Cox got away. She said a Camden County deputy picked her up and took her to the hospital.

Cox told Patterson that her attacker had "long dark hair and a beard, thirties to forties" and drove "an early 70's pickup truck". She did not give any name for this man. Patterson asked what officer had taken her to the hospital and Cox "didn't have a name". Patterson took Cox to her house.

A few days later, Cox told Patterson a different version of what had happened. Part of her story stayed the same, but she said that the man was "going to help her out to make some money". They stopped at a couple houses and she stayed in the car while the man went in. Next, she and the man went to an "elderly couple's house to test drive a car". Cox drove the car, the "elderly gentleman" sat in the front passenger seat and the man got in the backseat. The man shot the "elderly gentleman" in the back of the head. The man then went in the "elderly couple's house", and Cox heard a scuffle followed by a "shot or two". The man then ran from the house and they left in his truck. He told her that "if she ever opened her mouth that he would do away with her, and instructed her to tell the story that she had told

first". Cox said she had gotten $500. She again described the man as "[l]ate thirties, early forties, long dark hair and a beard".

Patterson suggested to Cox "that she go see an attorney that she needed to tell her story, that she should have counsel present". He loaned her $1,000 to do that.

(Legal file references omitted.) Defendant claims that it "was crucial to [his] defense that Cox and Fair were 'always' having money problems and 'always in arrears to somebody' " because "[t]his evidence would have helped the jury connect the dots pointing to Cox's culpability. . . . "

The record reflects that Cox was asked, on cross-examination, if she was "broke," and she responded "[m]aking bills, making enough for bills." Cox was also asked similar questions and testified that "[w]e had enough to pay our bills," and "[w]e didn't have enough money, barely scraping by, but we didn't have no extra money." Although Patterson described Cox and Fair as having "money problems" and being in "arrears," he gave no further information to explain what he meant by those descriptions. The minor linguistic differences between Patterson's deposition testimony and Cox's answers on cross-examination do not persuade us that the jury would have had a markedly different understanding of Cox's financial situation in February 1997 if the deposition had been admitted. There was sufficient other evidence in the case to support Defendant's argument that money concerns could have motivated Cox to commit the crimes for which Defendant was charged.

The other excerpts of Patterson's deposition that Defendant discusses are also cumulative to other evidence in the record. Cox testified that she was friends with Patterson and that Patterson and another friend picked her up from the hospital

after the events happened. Cox also testified that Defendant gave her $540, and said he would kill her, her relatives and everybody she knew if she told anyone what had happened. Cox admitted telling her friends a false story about being kidnapped. Because the evidence contained in Patterson's deposition was cumulative to a large quantity of evidence already in the record, the trial court did not abuse its discretion by excluding the deposition. Point V is denied.

### Point VI

■ Defendant's sixth point on appeal alleges that the trial court erred in approving the transcript that was filed with this Court. The following additional facts are relevant to this point.

After the notice of appeal was filed, problems developed in the preparation of the transcript. In February 2008, the court reporter certified the transcript of the trial proceedings. In June 2008, Defendant filed a motion with this Court disputing the accuracy of that transcript. On June 13, 2008, we entered an order referring the dispute over the accuracy of the transcript to the trial court and ordering the judge "to settle the dispute and certify the correct contents of the transcript."

On July 16 and 17, 2008, the trial court conducted a hearing on the accuracy of the transcript. Part of this hearing involved the trial court and the parties reviewing the certified transcript, noting alleged errors and making some corrections. The other part of the hearing consisted of testimony from court reporter Margaret Jones (Jones) about her preparation of the certified transcript. The following is a summary of her testimony.

In March 2007, Jones realized that there were problems with her stenographic machine that were going to interfere with the preparation of the transcript, and she did not have a separate audio recording of the trial proceedings. Jones used her "steno" notes to prepare the transcript. She dictated from the notes, and a transcriber from the Office of the State Court Administrator typed up the transcript. Jones then reviewed and proofread the transcript. After that process was completed, Jones certified the 5,660–page transcript. Jones believed that the certified transcript that she prepared accurately reflected what occurred at trial. Jones was not paid for her work in preparing the transcript. Approximately one week before the hearing, Jones was contacted by a paralegal working for Defendant's trial counsel. That conversation caused Jones to think about the issue from Defendant's point of view. Up until that conversation occurred, Jones believed the transcript was true and accurate. After that conversation, Jones changed her mind about her certification and decided that "to be fair to everybody" the transcript should not have been certified. Although she claimed some words were missing, she was not able to identify any particular part of the transcript that she believed was in error.

On August 8, 2008, the trial court entered an order correcting any errors in the transcript and certifying that the transcript as corrected was accurate. Defendant had asserted that there were approximately 100 errors in the 5,660–page transcript. With respect to many of these issues, it was unclear whether the court reporter had actually made an error or whether an attorney or witness had simply misspoke. Nevertheless, the trial court corrected the transcript to reflect what was meant. Defense counsel also asserted that there were 16 omissions with respect to rulings by the court. The trial judge rejected 13 of these alleged errors and found that the transcript was correct. For two omissions, the judge was able to determine what the ruling had been based upon the subsequent ac-

tions of the parties. The only error which could not be resolved concerned the death qualification of a small group of venirepersons, none of whom served on the jury. Finally, defense counsel raised 45 purported errors based upon the assertion that what was said did not make sense. The trial court rejected 24 of these claimed errors.

After entry of the trial court's order, we determined that there were still 16 potential errors that had not been addressed. Defense counsel asked that the certification of the transcript be withdrawn. We denied that request and explained that the trial court was merely required to settle any remaining disputes about inaccuracies in the certified transcript. On August 18, 2008, we ordered the trial court to resolve those remaining errors.

On September 10, 2008, the trial court entered a second order resolving the specific issues that had been noted in this Court's August 18th order. The trial court determined that: (1) as to three of the alleged errors, the transcript was correct; (2) seven other errors were corrected; and (3) six of the alleged errors could not be resolved, but Defendant was not thereby prejudiced.[5] The corrected certified transcript and legal file were filed with this Court on September 30, 2008.

On appeal, Defendant contends that he was denied due process by the filing of the corrected, certified transcript. He argues that Jones' testimony during the July 2008 hearing showed that she signed the certification under duress, and that the transcript is not true, accurate or dependable. We disagree.

■ "An incomplete record on appeal does not necessarily warrant reversal, as relief is only appropriate if the appellant can demonstrate that due diligence was employed in an attempt to correct the shortcomings and that the incomplete nature of the record prejudiced him." *Skillicorn v. State*, 22 S.W.3d 678, 688 (Mo. banc 2000); *see State v. Middleton*, 995 S.W.2d 443, 466 (Mo. banc 1999). Defendant exercised due diligence in asking the trial court to correct the record pursuant to the authority granted by Rule 30.04(g). The trial court corrected virtually all of the errors raised by Defendant. With respect to the very few that were not able to be corrected, the trial court made a finding that Defendant was not prejudiced. We agree with that ruling.

■ The thrust of Defendant's argument is that Jones' testimony during the July 2008 hearing effectively undid her prior certification of the transcript. The trial court did not accept that argument, nor do we. It was up to the trial court to assess the credibility of Jones' testimony and the reasons why she claimed her prior certification was in error. The trial court did not find Jones believable. Jones' inability to point out a single error in the transcript likely played a large part in the trial court's decision. Given the judge's superior opportunity to determine Jones' credibility, we defer to that assessment. *State v. Haslett*, 283 S.W.3d 769, 783 (Mo. App.2009). Once the trial court deter-

---

**5.** These alleged errors involved: (1) an objection during death qualification concerning a group of venirepersons who did not serve on the jury; (2) another objection to a question asked during death qualification of a venireperson who did not serve on the jury; (3) a part of the State's opening statement to which no objection was made; (4) an objection by the State during the cross-examination of Corporal Sederwall to "hearsay" testimony regarding the statements of Larry Graham who had not yet testified—but did testify later in the trial; and (5) a question to Cox and her answer about parking near the Walters' house to which no objection was made.

mined that the transcript had been properly certified, all other disputes about the correctness of the transcript were the responsibility of the trial court to settle. *See, e.g., State v. Formanek,* 792 S.W.2d 47, 48–49 (Mo.App.1990). The judge did so. "Since the trial court has approved the transcript before us, we accept it as written." *State v. Hughes,* 748 S.W.2d 733, 740 (Mo.App.1988).

■ As noted above, an incomplete record only requires reversal if the defendant is prejudiced. *Skillicorn,* 22 S.W.3d at 688. Claims of prejudice must be specific. *See State v. Christeson,* 50 S.W.3d 251, 271–72 (Mo. banc 2001); *Middleton,* 995 S.W.2d at 466. Here, Defendant merely makes the general allegation that the certified transcript was inaccurate. Defendant had the opportunity to raise all alleged errors with the trial court. There is no claim on appeal that the trial court erred in any specific way in ruling on the issues that Defendant raised. Defendant has not pointed out a single error relevant to any issue that he raised on appeal. Nor does he claim that an error in the transcript prevented him from raising other issues that he wished to assert. Based upon this Court's own thorough review of the record, our task has not been impeded by any alleged deficiencies in the certified transcript. In sum, Defendant has failed to meet his burden of proving prejudice. Point VI is denied.

### Point VII

■ Defendant's seventh point alleges that he was deprived of his right to due process because "the inordinate delays caused by 'mechanical problems' and 'human error' in producing the transcript" did not allow his appeal to be processed in a timely and effective manner. We disagree.

■ Defendant has not cited a case, nor have we found one in our independent research, in which a conviction has been overturned based upon delay in the appellate process. In order to establish a due process violation due to substantial delay in processing an appeal, a defendant must establish prejudice. *See State v. Crabtree,* 625 S.W.2d 670, 674 (Mo.App.1981). As the *Crabtree* court held "mere passage of time between the filing of a notice of appeal and the completion of the trial transcript should not void a conviction, unless it clearly appears that the delay in some way impairs a defense which would otherwise be available to the defendant where a new trial is ordered for trial error." *Id.* at 675. The holding in *Crabtree* is consistent with the general rule regarding the scope of our review which we have specifically stated is that "this Court reviews for prejudice, not mere error, and will reverse only if prejudice is found." *State v. Thomas,* 290 S.W.3d 129, 132 (Mo.App.2009). Because Defendant has not established his entitlement to a new trial based upon trial error, any delay in processing this appeal was not prejudicial. *See Crabtree,* 625 S.W.2d at 675. Point VII is denied.

The judgment of the trial court is affirmed.

BARNEY and BURRELL, JJ., Concur.