

# Missouri Court of Appeals

### Southern District

### Division Two

DANNY RAY WOLFE, )
)
    Movant-Appellant, )
)
v. ) No. SD33017
)
STATE OF MISSOURI, ) **Filed: Oct. 30, 2014**
)
    Respondent-Respondent. )


### APPEAL FROM THE CIRCUIT COURT OF CAMDEN COUNTY

Honorable Kenneth M. Hayden, Circuit Judge


**<u>AFFIRMED</u>**

In June 2006, a jury found Danny Ray Wolfe ("Movant") guilty of two counts of first-degree murder, two counts of armed criminal action, and one count of first-degree robbery for offenses committed against Leonard and Lena Walters in February 1997. *See* sections 565.020, 569.020, and 571.015.[1] This court affirmed Movant's convictions and sentences on direct appeal in *State v. Wolfe*, 344 S.W.3d 822, 841 (Mo. App. S.D. 2011).[2]

---

[1] All statutory references are to RSMo 2000. All rule references are to Missouri Court Rules (2014).

[2] The trial court sentenced Movant to serve consecutive sentences of life in prison without the possibility of parole on each murder count, life in prison for robbery, and a fifty-year sentence on each armed criminal action offense. Movant had been previously convicted of these same offenses, and the trial court had imposed the death penalty on the murder counts. Those convictions and sentences were set aside after Movant successfully appealed the denial of his post-conviction relief motion regarding the first trial. *Wolfe v. State*, 96 S.W.3d 90, 95 (Mo. banc 2003). Different counsel represented Movant at his second trial.

Movant now appeals the denial of his Rule 29.15 post-conviction relief motion ("motion") after an evidentiary hearing ("the evidentiary hearing"). Movant contends the motion court clearly erred in denying relief because Movant proved that he received ineffective assistance of counsel when his trial counsel:[3] (1) failed "to adduce evidence that Terry Smith was the actual perpetrator of the murders"; and (2) failed to call two witnesses, Timothy Whittle and Joyce Whittle,[4] who would have contradicted the testimony of State's witness Jessica Cox and "establish[ed] that other persons had committed the murders[.]" Movant contends that but for trial counsel's ineffective representation, "a reasonable probability exists that the result of [his] trial would have been different."

Because the motion court did not clearly err in finding that the decisions Movant now challenges constituted reasonable trial strategy, we deny Movant's points and affirm the motion court's denial of post-conviction relief.

### Applicable Principles of Review and Governing Law

We begin our analysis with a presumption that the motion court's findings and conclusions are correct, *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009); we will reverse the decision of the motion court only if we determine that its findings and conclusions are clearly erroneous. *Matthews v. State*, 175 S.W.3d 110, 113 (Mo. banc 2005).

> To be entitled to post-conviction relief for ineffective assistance of counsel, the movant must satisfy a two-prong test. First, the movant must show that his counsel failed to exercise the level of skill and diligence that a reasonably competent counsel would exercise in a similar situation.

---

[3] At the trial, three attorneys (Cynthia L. Short, Bruce R. Tepikian, and Craig Proctor) appeared for Movant, and we will refer to them collectively as "trial counsel" unless an individual reference is necessary. Other attorneys and individuals assisted trial counsel in preparing for trial, but they were not identified as appearing for Movant at trial. Where witness testimony indicates involvement by persons in addition to trial counsel in preparing Movant's defense, "trial team" will be used.

[4] Ms. Whittle was also referenced in the evidence as having the last names of Ash and Matney, but we will refer to her as Ms. Whittle throughout the opinion.

2

> *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674
> (1984). Second, the movant must show that trial counsel's failure prejudiced
> the defendant. *Id.* Both of these prongs must be shown by a preponderance
> of the evidence in order to prove ineffective assistance of counsel.

*Zink*, 278 S.W.3d at 175. "The movant bears the burden of proving grounds for relief by a preponderance of the evidence." *Nicklasson v. State*, 105 S.W.3d 482, 484 (Mo. banc 2003).

When it comes to decisions of trial strategy, there is a strong presumption that strategic decisions made by trial counsel are reasonable. *Matthews*, 175 S.W.3d at 115. Such decisions may serve as a basis for granting post-conviction relief only if they are unreasonable; "[t]he choice of one reasonable trial strategy over another is not ineffective assistance." *Zink*, 278 S.W.3d at 176.

### Facts and Procedural Background

*The Underlying Offenses*

We draw upon our *Wolfe* opinion for this summary of the evidence without further attribution. 344 S.W.3d at 825-30, and 835. As on direct appeal, we present that evidence as viewed in the light most favorable to the verdicts, *Storey v. State*, 175 S.W.3d 116, 125 (Mo. banc 2005), and we recount only those facts necessary to address Movant's ineffective-assistance claims. We also "view the record in the light most favorable to the motion court's judgment, accepting as true all evidence and inferences that support the judgment and disregarding evidence and inferences that are contrary to the judgment." *Hardy v. State*, 387 S.W.3d 394, 399 (Mo. App. S.D. 2012). We will recite some evidence that was unfavorable to the judgments, but we do so only to provide the necessary context for Movant's ineffective assistance claim.

3

In February 1997, Mr. and Mrs. Walters had a Cadillac for sale. That same month, Movant had unsuccessfully offered to sell Gregory Addington a .25 caliber pistol.

Late on the night of Wednesday, February 19, 1997, Jessica Cox went to a bar. Movant approached her there and introduced himself. Movant wanted Ms. Cox to sell drugs for him, and at around 1:00 a.m. on Thursday morning, Ms. Cox left the bar with Movant in his truck to get the drugs. They eventually wound up at Movant's hotel, where Movant donned a camouflage jacket and nylon "parachute" pants.

Movant and Ms. Cox left the hotel around 4:30 a.m. They stopped at a gas station, and Movant told Ms. Cox to buy a pair of jersey gloves. They proceeded to Greenview, where Movant pointed out the Walters residence and said that they would be going there.[5] Movant drove past the residence and parked by the road. Movant told Ms. Cox that Mr. and Mrs. Walters had money, they were expecting him early in the morning to test-drive the Cadillac, and that he intended to rob them. Movant put on gloves; he also handed Ms. Cox a pair of gloves, telling her that she should wear them.

Around 6:00 a.m., the pair returned to the Walters residence, and Movant parked behind the Cadillac. Mrs. Walters answered the door, and Mr. Walters walked out to the Cadillac. Movant told Ms. Cox to join them, and Mr. Walters invited Ms. Cox to drive the car. Ms. Cox asked Mr. Walters to come with her on the test drive, and he agreed to do so. Mr. Walters was riding in the front passenger seat, and Movant was sitting behind him in the back seat.

As Ms. Cox drove back toward the Walters residence, she "heard a loud bang[.]" When she looked over, Mr. Walters took "his last breath" and put his head down. Ms. Cox

_____

[5] Ms. Cox did not know the identity of Mr. and Mrs. Walters until sometime later.

4

also saw something that "looked like a barrel of a gun." Movant took Mr. Walters's wallet and remarked, "[T]his guy is loaded."

When they reached the Walters residence, Movant told Ms. Cox to get into his truck, and Movant went inside the house. Ms. Cox heard a "commotion." She also heard other noises, including a shot, emanating from the house. After about seven or eight minutes, Movant came out of the house, and he was carrying a safe. He put the safe in the bed of his truck and drove to a wooded area. Movant took the safe and some tools into the woods, and Ms. Cox saw him open the safe with the tools. Movant put some items from the safe into his pocket, leaving the safe and some papers on the ground.

Movant then drove to some condominiums, where he asked the custodian for a key to a storage shed. The custodian observed that Movant was wearing silky, nylon pants.

Movant went to another location at the condominiums for five to ten minutes. When he returned to the truck, Movant was wearing white painter's pants and a sweatshirt. Movant told Ms. Cox that he had thrown the gun into the lake.[6] Around 8:00 a.m., Movant drove to a shopping center near Camdenton and bought some paint. Ms. Cox asked Movant to take her to the Osage Beach Hospital, where he dropped her off and gave her $540 in cash. Movant told Ms. Cox that he would kill her and her family if she told anyone what had happened. Ms. Cox called some friends and told them that she had been kidnapped.

Around 8:30 a.m. on February 20th, a propane gas deliveryman, Kenneth Stoller, drove past the Walters residence and noticed a man sitting in the front passenger seat of the Cadillac that was for sale. When Mr. Stoller came back from the opposite direction, at around 10:30 a.m., he still saw a man sitting in the front passenger seat. He thought it odd that the man had not moved.

---

[6] The custodian testified at trial that the condominium property was "right on the [l]ake."

5

A mail carrier, Charles Lunaberg, usually delivered mail to the Walters mail box between 1:30 and 3:30 p.m. He knew that they picked their mail up daily as their box on the highway was always empty the next day when he delivered their mail. That familiar pattern was broken on Thursday, February 20, when Mr. Lunaberg noticed that the mail from the day before was still in their box. The following day, the accumulated mail was still in the box.

On an occasion that occurred after Movant had offered to sell the gun to Mr. Addington, Movant went into the bar that Mr. Addington managed and exchanged quarters that "were in some sort of bags" for approximately $25 in currency.

On Sunday, February 23, Charles Rickey went to the Walters residence twice to dump septic tank waste on their field. Mr. Rickey had an agreement with Mr. Walters to pay for each load that he dumped. Mr. Rickey dumped his second load around noon. As he was leaving, he saw Mr. Walters sitting in the passenger side of the Cadillac. Mr. Rickey approached the car and noticed dried blood on Mr. Walters's clothes. Mr. Rickey opened the door and touched Mr. Walters, who "felt like he was all like concrete." Mr. Rickey called 9-1-1. His father, who was with him at the time, went to the door of the house and called for Mrs. Walters, but he received no response.

Officers recovered a spent shell casing from Mr. Walters's collar, and a live .25 caliber round from the back seat of the Cadillac. Officers located Mrs. Walters's body inside the house. It was covered in blood and surrounded by more blood on the floor. A shotgun lay near her feet, and a bloody knife was laying on the floor in the kitchen. Tennis-shoe type footprints were present on the kitchen floor. The prints did not match the shoes on Mrs. Walters's body. Autopsies later indicated that Mr. Walters died from a gunshot wound to his

6

head that perforated his spinal cord. Mrs. Walters had a shotgun wound, but she died from a stab wound that penetrated her heart.

On February 27, Ms. Cox contacted an attorney. Her attorney subsequently secured an agreement from the prosecutor that granted Ms. Cox immunity from prosecution in exchange for her promise to provide truthful testimony against Movant. That same evening, Ms. Cox led officers to the safe. Along with the safe, the officers found papers bearing Mr. Walters's name, a bag of quarters, and some loose quarters.

The police recovered items from a dumpster at Movant's hotel, including a live .25 caliber round, a lease agreement bearing Movant's name, a camouflage coat, gloves, a partially-full box of .25 caliber ammunition with a black hair inside,[7] and another box of .25 caliber ammunition. A search of a storage shed at the condominium where paint was stored produced black nylon pants and a pair of tennis shoes. Laboratory analysis subsequently showed that the shoeprints on the kitchen floor of the Walters home were consistent with the tennis shoes recovered from the shed. A search of Movant's truck yielded some brown jersey gloves.

The police interviewed Movant, who initially denied knowing Ms. Cox. He subsequently admitted that she had accompanied him to his hotel room, but he denied taking Ms. Cox to the condominiums.

*The Post-Conviction Hearing*

The motion court received testimony and exhibits at the evidentiary hearing on March 21 and 22, 2013, and it held the record open to allow the presentation of additional evidence by stipulation or agreement. The motion court's findings refer to deposition testimony given by Mr. Tepikian after March 22nd, and both parties cite this deposition in

---

[7] Movant presented evidence at trial that the hair belonged to Ms. Cox.

7

their briefs. The motion court also took judicial notice of the underlying criminal files for the 1998 and 2006 trials, as well as Movant's first post-conviction hearing held in 2001.

Ms. Short's opening statement at the second trial included that the evidence would show that Ms. Cox participated in the murders, Ms. Cox told lies about what had occurred, witnesses saw Mr. and Mrs. Walters alive after the time Ms. Cox claimed they had been murdered, a forensic pathologist would place the time of their deaths closer in time to the time that their bodies were discovered, there were problems with the evidence recovered from the murder scene and the hotel dumpster, and Movant was in Kansas City from the afternoon of February 20th until the next day.

*Testimony from Ms. Short*

Ms. Short had been "a lead attorney" in the capital office of the public defender's system before she went into private practice in 2003. As private counsel, she acted as the lead attorney for Movant at his second trial and was assisted by two attorneys from another firm, Mr. Proctor and Mr. Tepikian. The trial team included other attorneys and a paralegal from Messrs. Proctor and Tepikian's firm, and two private investigators. Ms. Short obtained the files from Movant's first trial, spoke with Movant's counsel from that trial, and "reviewed the prior trial transcript and whatever reports had been generated by" those who worked for the defense at Movant's first trial. The trial team also "started [the] discovery process over again[.]"

Ms. Short explained that "the theory of [the] defense was that [Movant] was innocent and that the time of death was inconsistent with the testimony that had been provided by the main witness, which was [Ms.] Cox." The trial team worked to develop information to

8

impeach Ms. Cox, and Ms. Short was responsible for cross-examining her at trial.[8]  Trial counsel also presented evidence that other people believed they had seen Mr. and Mrs. Walters alive after the time of death identified by Ms. Cox.  The trial team had also investigated "the alternative theory that somebody else committed the crime."  Mr. Smith was of interest to the trial team, but they did not have anything "definitive" like "a fingerprint, DNA, [or] an eyewitness" that would suggest that he had committed the murders.

Ms. Short recalled that the Whittles were siblings, and she thought that Ms. Whittle would be "overall probably the more credible" witness compared to Mr. Whittle, who was in custody.  Ms. Short thought that someone from the trial team went to see Mr. Whittle, and Ms. Whittle had previously executed an affidavit for a defense investigator.  While Ms. Short thought that Ms. Whittle "had information that was important," she also thought that a witness's credibility was important.  Ms. Short attended a pretrial interview of Ms. Whittle with one of the investigators, and she subpoenaed Ms. Whittle for trial.  When Ms. Whittle arrived at the courthouse for trial, it appeared to Ms. Short that Ms. Whittle "had been drinking[.]"  Ms. Short could smell alcohol, and she decided not to call Ms. Whittle as a witness.

*Testimony from Mr. Grothaus*

Dan Grothaus worked as a private investigator on Movant's case beginning in 1998. Mr. Grothaus had been unsuccessful in his attempt to relocate Ms. Whittle for purposes of Movant's first trial, but he found her again before the second trial.  Ms. Short and Mr. Grothaus met with Ms. Whittle in March 2006, and they discussed the fact that Ms. Whittle

---

[8] Ms. Short's cross-examination of Ms. Cox consumed over 205 pages of transcript, a figure that includes objections and matters addressed by the trial court.

had been in prison and had a "history with drugs and alcohol." Ms. Whittle was not available to testify at the evidentiary hearing; a death certificate indicated that she had died in 2007.

*Testimony from Mr. Tepikian*

Mr. Tepikian testified via deposition that when he became involved in the case after the first trial, the trial team "wanted to reevaluate the whole case[,]" and they identified people to be re-interviewed. In addition to receiving files produced by Movant's former counsel, the trial team received and reviewed files that Movant "had put together himself." They also requested "a complete file" from the State. The time of death was developed as a "major theory of the case" because there were witnesses who "claimed to have seen [Mr. and Mrs. Walters] alive after the time period when Ms. Cox claimed that [Movant] had killed them." The trial team wanted to show that the murders happened "on the Friday" that Movant was in Kansas City. Another major defense strategy was to "discredit the testimony of Ms. Cox and raise issues related to her involvement . . . in the murders[.]" "[I]f her story was not credible, then certainly that would've bolstered the additional testimony of the disinterested witnesses that presumably had seen [Mr. and Mrs. Walters] . . . . [c]oupled with [Movant's] not being in the area." The trial team also focused on whether the search of the hotel dumpster "was done appropriately" in an attempt to show that the evidence located there could have been "left by others or contaminated[.]"

The trial team also discussed whether a third party had committed the murders, and they "really looked at everything that was going on in Camden County around that time[.]" They knew that Mr. Smith had been a person of interest to law enforcement before Ms. Cox came forward, and they "tried to run that to ground as best [they] could." They considered

10

whether there were any connections between Mr. Smith, Phillip Dayton, and Ms. Cox. Mr. Tepikian recalled that the State's motion in limine to keep out evidence about whether someone else committed the crime had been overruled, and he understood that trial counsel could have presented such evidence. But the trial team also had to consider whether doing so would have "been consistent with what [they] were doing with regard to the other defense approach in the case."

The trial team was not "able to catch up with [Mr.] Smith and talk with him." The trial team did interview Mr. Dayton "at a correctional facility outside of Springfield." Mr. Dayton was "likely . . . the person that needed to be called to support [Mr.] Smith doing the crime[,]" but there were concerns about Mr. Dayton's credibility. Mr. Tepikian testified that trial counsel and Movant concluded that they "had a better case putting together with regard to Ms. Cox and the challenges on time of death and when [Mr. and Mrs.] Walters were seen alive as opposed to also putting out [that] another person might've done it." Trial counsel "put forth the defense strategy [they] felt had the best chance of success at trial[.]"

Although Mr. Tepikian never met with the Whittles, he understood that Ms. Whittle had said that Ms. "Cox had told her that it was not [Movant] that committed these murders[.]" He did not recall "the circumstances related to [Mr. Whittle,]" but he thought that there were credibility issues as to both of the Whittles. Ms. Whittle appeared at the courthouse, but, after Ms. Short reported that Ms. Whittle "was drunk and smelled of liquor[,]" the trial team decided not to call her as a witness. While it might have been possible to call Ms. Whittle as a witness during the next day of trial, they did not consider doing so because "there were question marks as to whether [they] called her in the first

11

place." The trial team was concerned about "how her credibility would be challenged on [c]ross [e]xamination in an aggressive [c]ross."

Mr. Tepikian saw Ms. Short's cross-examination of Ms. Cox, which lasted "at least a full day, if not a little longer." Mr. Tepikian thought that Ms. Short's cross-examination achieved everything the trial team had hoped to achieve.

*Testimony from Mr. Proctor*

Mr. Proctor testified that he worked on Movant's case with "a core team of probably seven or eight people, most of whom were attorneys[.]" He reviewed the materials from Movant's first trial, its appeal, and the related post-conviction proceedings. Mr. Proctor "went through the files alphabetically, started with A, there was [sic] so many, and just went through them[.]" Trial counsel developed "many" defense theories, including that Ms. Cox was not credible and that the time of death did not match her testimony. Mr. Proctor thought that while the outcome of the trial "did not work out" as hoped, Ms. Short's cross-examination of Ms. Cox at trial "had gone very well[,]" and Ms. Cox "was literally rocking back and forth, based upon the points that Ms. [Short] had made[.]"

The defense that someone else had committed the crimes was discussed by the trial team based on "[e]very theory you can imagine[,]" and they "spent a lot of time talking about those issues." This potential defense was "discussed . . . directly with [Movant] on multiple occasions[,] and [it was] decided as a matter of trial strategy that that would not be an effective means of handling this case." The decision was unanimous and it included Movant. Mr. Proctor was concerned that what the witnesses would say at trial "might not even be consistent with what they told [the trial team]." The trial team decided that their "other theories were the dominant ones and had the most chance of success and [they]

12

frankly didn't really believe at the end of the day that putting on people like that were going to advance the ball and might actually cause [them] to suffer a credibility hit." Mr. Proctor thought it would be "a terrible way to proceed" to put "people with some tenuous alleged tie with the case . . . on the witness stand[,]" and he believed that presenting multiple theories could weaken their defense.

Mr. Proctor recalled having information in the files on Mr. Smith -- including information about pistols -- and having discussed Mr. Smith as a possible suspect. Mr. Proctor understood Mr. Dayton to be an acquaintance of Mr. Smith. Mr. Proctor said that Mr. Dayton's testimony from the first trial and post-conviction hearing was available to Mr. Proctor before Movant's second trial, and Mr. Proctor interviewed Mr. Dayton. In considering whether to call Mr. Dayton as a witness, Mr. Proctor's "impression was [that] there was no way ever [he] would put this guy on the stand." Mr. Proctor "kn[e]w he wasn't credible because he lied to [them] during the entire interview."

Concerning the Whittles, Mr. Proctor recalled that the "gist" of information from at least one of them was that Ms. Cox had said that Movant was not involved in the murders.

*The Motion Court's Findings*

The motion court found that "[n]one of the witnesses called by Movant had any personal knowledge of [Mr.] Smith murdering [Mr. and Mrs. Walters] nor could they place him at the crime scene at any relevant time." The motion court also found that evidence about Mr. Smith would have increased the chance of a failed defense because "presenting weak evidence of an alternative suspect would have made the State's evidence against Movant seem stronger by comparison." The motion court found that not pursuing the defense that Mr. Smith committed the murders was "reasonable and demonstrate[d] that trial

13

counsel acted competently on this issue." Additionally, the motion court found that "Movant presented no evidence of . . . a direct act connecting [Mr.] Smith to the murder of [Mr. and Mrs. Walters]." Therefore "none of Movant's proffered evidence attempting to blame [Mr.] Smith for the murder[s] . . . would have been admissible" and "[c]ounsel is not ineffective for failing to present evidence that is inadmissible. Finally, the motion court found that "there is no reasonable probability that presentation of [this] evidence would have resulted in an acquittal for Movant[.]"

Regarding Mr. and Ms. Whittle, the motion court found that trial counsel was "not ineffective for failing to call" these witnesses. The motion court found that Mr. Whittle was "not credible" and that "trial [counsel] had serious doubts about the credibility of" the Whittles. Further, it found reasonable the decision "not to call [Ms. Whittle] as a witness when she appeared to have been drinking and smelled of alcohol." The motion court found that the strategy of discrediting Ms. Cox was reasonable and it was "employed ably and effectively." The motion court also found "no reasonable probability that calling [the Whittles] would have resulted in an acquittal for Movant."

This appeal timely followed.

## Analysis

### *Point I – Evidence of Mr. Smith as the Murderer*

Movant's first point contends trial counsel was ineffective for "failing to adduce evidence that [Mr.] Smith" committed the murders, and the failure to offer this "evidence" was prejudicial to him because had such "evidence" been presented, "a reasonable probability exists that the result of [Movant's] trial would have been different." Movant's point is deficient in that it does not identify the "evidence" showing that Mr. Smith

14

committed the murders. Nonetheless, an *ex gratia* review of the "evidence" cited in the argument that follows the deficient point reveals no clear error by the motion court.

Movant relies on the following evidence adduced at the evidentiary hearing. A now-retired Camden County Sheriff's detective, Richard L. Dryer, had followed up on the theft of two guns in January 1997 from Gary Anderson's home committed by Kenneth Palmer and Brian Mummert. Detective Dryer testified that these men could not identify a photo of Mr. Smith, but they did identify Mr. Dayton as one of two individuals who in turn received the guns from them. Gary Anderson testified that the two guns were .25 caliber pistols made by Sundance Industries, and a law enforcement report identified the serial numbers of the guns. Mr. Palmer testified that he and Mr. Mummert[9] stole two .25 caliber hand-guns from Mr. Anderson's home, and they later provided them to Mr. Dayton and Mr. Smith.

Mr. Dayton testified from prison via deposition that he and Mr. Smith obtained "two 25 automatics" from some "kids[,]" and both of the guns "ended up with Kevin[.]" He was not with Mr. Smith from February 19-23, 1997, and he had no personal knowledge of what Mr. Smith was doing at that time. Before that time, possibly in January 1997, he went with Mr. Smith two or three times to look at a house on Highway 7 outside of Greenview that Mr. Smith was thinking of burglarizing, and he saw that there was a car for sale in the yard. Mr. Dayton believed that Mr. Smith "had some inside information that some people [at the house] had some money or something[.]" Mr. Dayton identified a photograph of the Walters house as depicting the house that he had described, but he stated that he thought the porch was on the front of the house and that its driveway was longer. In looking at another

---

[9] Mr. Mummert testified in a deposition about the theft of the guns. Three reports associated with Mr. Mummert were also admitted into evidence, but -- contrary to the summary in Movant's brief -- Mr. Mummert did not identify Mr. Smith in any of the exhibits filed with this court and cited in Movant's brief as one of the individuals that received the guns.

15

photograph of the Walters house, Mr. Dayton said "it could or could not be the house" that he saw with Mr. Smith. Mr. Dayton acknowledged meeting Movant in the Camden County Jail at "the end of 96 or 97."

A deposition of Barbara Reeder taken in prison in 2001 was admitted into evidence, along with a 2008 death certificate for Ms. Reeder. Ms. Reeder testified that she had seen a woman she later learned to be Ms. Cox with Mr. Smith on several occasions. The transcript of the testimony of William Frederick Moss from the first post-conviction proceedings was also admitted into evidence, along with a 2008 death certificate for Mr. Moss. Mr. Moss had testified that in early January 1997, Mr. Dayton, accompanied by Mr. Smith, brought some things for Mr. Moss to hold, including "a little .25 with a red laser sight[.]" Mr. Dayton came back later and retrieved the gun. Angelia Moss testified at the evidentiary hearing that she recalled an occasion when Mr. Smith and Mr. Dayton came to see Mr. Moss. They had a weapon with "a red laser light[,]" and she "[k]inda" remembered either Mr. Dayton or Mr. Smith asking to borrow a ski mask.

Kevin Nelson testified that Mr. Smith provided him with one .25 caliber handgun in January 1997, and he provided a second one of the same caliber "in February or March of 1997[.]" Mr. Nelson thought that both guns were in his house at the time his "house caught on fire" in March 1997, but the police recovered only one of the two guns.

A Sundance Industries .25 caliber handgun with a serial number matching one taken from Mr. Anderson's house was examined by Kathleen Green, a criminalist for the Missouri State Highway Patrol Crime Laboratory. Her work included the examination of a bullet recovered from Mr. Walters, along with an associated cartridge. Ms. Green eliminated the gun she evaluated as having been used to murder Mr. Walters. Ms. Green thought that

16

another gun of the same make and model could have similar characteristics, but she could not eliminate any gun without examining it.

Based on the foregoing evidence, Movant argues that "[t]here was no reasonable reason for not presenting evidence pointing to [Mr.] Smith" as the person who had killed Mr. and Mrs. Walters. We disagree.

"[F]or trial strategy to be the basis for denying postconviction relief the strategy must be reasonable." *State v. Hamilton*, 871 S.W.2d 31, 34 (Mo. App. W.D. 1993). "To hold otherwise would be to say that any decision of trial counsel no matter how ill-advised could not constitute ineffective assistance." *Johnson v. State*, 125 S.W.3d 872, 876 (Mo. App. S.D. 2003). At the same time, "[c]ounsel is allowed wide latitude in conducting a defense and may use his best judgment in matters of trial strategy[,]" *id.*, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690; *see also Johnson v. State*, 406 S.W.3d 892, 900 (Mo. banc 2013). This is because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. "Reasonable trial strategy does not become ineffective assistance of counsel because it did not work as hoped." *State v. Johnston*, 957 S.W.2d 734, 755 (Mo. banc 1997).

Here, as the motion court found, the evidence presented by Movant did not include a witness with "any personal knowledge of [Mr.] Smith murdering [Mr. and Mrs. Walters] nor could [a witness] place him at the crime scene at any relevant time." Ms. Short, Mr. Proctor, and Mr. Tepikian each testified that they investigated and considered the defense that Mr.

17

Smith was the murderer. Mr. Proctor and Mr. Tepikian each recalled discussing the theory with Movant, and the idea was ultimately rejected. Ms. Short recognized that they did not have anything "definitive" like "a fingerprint, DNA, [or] an eyewitness" connecting Mr. Smith with the murders. Mr. Proctor reasoned that it was "terrible" to put on witnesses who had "some tenuous alleged tie with the case"; there was a concern that some witnesses would not testify consistently and the defense could thereby "suffer a credibility hit"; Mr. Dayton, in particular, was not considered credible enough to put on the stand because he had not been truthful in his pretrial interview; the other defense theories had a greater chance of success; and presenting multiple theories to the jury could weaken the defense. Likewise, Mr. Tepikian did not think that presenting Mr. Smith as the murderer was "consistent with what we thought was the best approach for the defense." Doing so would have also required calling Mr. Dayton, who was not regarded by Mr. Tepikian as a credible witness.

The defense theory trial counsel chose to present after their investigation "was that [Movant] was innocent and that the time of death was inconsistent with the testimony that had been provided by . . . [Ms.] Cox." The defense made use of witnesses who said they had seen Mr. and Mrs. Walters "alive after the time period when Ms. Cox claimed that [Movant] had killed them." Coupled with this evidence was an attempt to discredit Ms. Cox and question her "involvement . . . in the murders[.]" Additionally, trial counsel attempted to show that the evidence taken from the dumpster could have been "left by others or contaminated[.]"

The motion court did not clearly err in finding trial counsel's strategy reasonable. Trial counsel chose not to present a defense that they regarded as weaker than their other defenses and would involve presenting a witness they did not regarded as credible. As the

18

motion court observed, presenting such a defense would have actually "made the State's evidence against Movant seem stronger by comparison." None of the evidence cited by Movant placed Mr. Smith at the crime scene at the time of the murders. The absence of such evidence would have emphasized the significance of the tennis shoe-like print on the kitchen floor that was consistent with the tennis shoes recovered (along with black nylon pants) from the condominium storage shed after the custodian had seen Movant on the morning of February 20 wearing silky nylon pants. The criminalist's testimony excluding the .25 caliber handgun possibly associated with Mr. Smith as one of the murder weapons also supported trial counsel's strategy of focusing on the weaknesses in the State's case instead of trying to prove someone else's guilt by the use of even weaker evidence.

Because the motion court did not clearly err in finding that Movant failed to prove deficient performance, our inquiry ends. *Zink*, 278 S.W.3d at 175. Point I fails.

*Point II – Evidence Regarding Mr. and Ms. Whittle*

Point II contends Movant received ineffective assistance of counsel when Mr. and Ms. Whittle were not called as witnesses because their "testimony would have supported [Movant's] defense by contradicting the trial testimony of [Ms. Cox] and by establishing that other persons had committed the murders, not [Movant]." Movant argues that trial "counsel acknowledged that the Whittles' testimony was important[,]" and "[t]here was no sound reason under the circumstances of [Movant's] case for [trial] counsel to have not presented the Whittles' testimony to the jury." We disagree.

The evidence presented by Movant on this issue included Mr. Grothaus's testimony that Ms. Whittle informed him in the fall of 1998 that Ms. Cox had spoken to her about the murders. Ms. Whittle had provided an affidavit before her death, and it was admitted at the

19

evidentiary hearing as Exhibit 20.  Ms. Whittle affied that Ms. Cox told her at a "Jiffy Stop" in February 1997 that she had "witnessed a murder of a man[.]"  Ms. Cox allegedly said that two men were involved, one of whom shot the victim in the head, and Ms. Whittle recalled the names of the men as "Brian Somebody, and Eric Somebody maybe."  Ms. Cox's affidavit did not identify Movant as one of the two men.

Mr. Whittle's February 2013 deposition was admitted as Exhibit 1.  In it, he acknowledged that he was in prison in connection with a firearm offense and that he had "other prior convictions" for "kidnapping, robbery, assault, manufacturing [methamphetamine], possession of [stolen] firearms[,] . . . . child endangerment, [and] sales of cocaine."  Mr. Whittle stated that he had never met Ms. Cox before late 1997 or 1998, but after he met her, Ms. Cox told him that "[t]hey told [her] that if [she] testif[ies] that [Movant] killed these people, then they would drop charges on [her] boyfriend and let him out of the county jail.  And that they would give her immunity so she wouldn't be charged with accessory to murder, or anything like that."  Alan Fair was Ms. Cox's boyfriend.  Mr. Whittle said he was "called to testify at that trial" in 1998, but he was unaware that a retrial had occurred in 2006.  Later in his deposition, he stated that he had never testified in court about the matter.

Mr. Whittle testified that he had provided an affidavit in 2000, and "they" did not put in it that Ms. Cox "admitted that there were two other guys with her and her boyfriend that done this robbery."  Mr. Whittle's affidavit was also admitted at the evidentiary hearing as Exhibit 2.  It stated that Ms. Cox "inferred that it was two other men by the name of Bryan and Eric, that [Ms. Cox] was with" when Mr. and Mrs. Walters were murdered.  Later in the deposition, Mr. Whittle said that "[t]he only thing they left out is that I said that [Mr.] Fair

20

was with them." Despite this alleged defect, Mr. Whittle signed the affidavit without having the omitted information included. According to Mr. Whittle, he talked about the matter with Ms. Whittle. Ms. Whittle told him that Ms. Cox "told her that her boyfriend, [Mr. Fair], had killed the people."

Mr. Whittle stated that he first met Movant in prison "[p]robably in '80" but he "probably had two conversations with him in all of [his] life. Three at the most. [They] would say hi. Hey, what's up? That kind of stuff. [Mr. Whittle] wouldn't call that a conversation." The affidavit, however, stated that he had "known [Movant] for about 25 years. [Mr. Whittle] had worked with him on several occasions." In contrast, Mr. Whittle denied in his deposition that he had ever worked with Movant, and he testified that he "didn't personally know [Movant]." Despite that denial, he subsequently provided details about Movant, including his prison sentences, his criminal offenses, that he worked for a construction company, his inclination to "have a good time[,]" and his inability to finish a job because of his drinking.

"If counsel believes that the witness's testimony would not unqualifiedly support the defense, the decision of whether to call the witness is a matter of trial strategy that will not support a finding of ineffective assistance of counsel." *State v. Johnson*, 901 S.W.2d 60, 63 (Mo. banc 1995). Witness credibility may be considered in evaluating whether a decision against calling a witness was a reasonable trial strategy. *See Barton v. State*, 432 S.W.3d 741, 751 (Mo. banc 2014) (movant did not overcome the presumption of reasonable trial strategy where the credibility of the witness not called "certainly would have been an issue" and a different reasonable strategy was employed); *State v. Johnson*, 943 S.W.2d 285, 292 (Mo. App. E.D. 1997) (evidence that a witness was not regarded as credible by defense

21

counsel supported the finding that not calling the witness "was an exercise of reasonable trial strategy").

At the evidentiary hearing, Ms. Short recalled that Ms. Whittle seemed "more credible" than Mr. Whittle. But when Ms. Whittle came to court appearing as she had been drinking and smelling of alcohol, trial counsel decided that they would not call her as a witness. Even though Ms. Whittle could have been brought back to court the following day -- when she might or might not have appeared in a better state -- Mr. Tepikian recalled that trial counsel questioned whether they should have even "called her in the first place" because they were concerned that she would not appear credible after "an aggressive [c]ross[-]examination." While Ms. Short thought Ms. Whittle's testimony was important, she also thought it important that Ms. Whittle appear credible to the jury, and Mr. Grothaus had testified that Ms. Whittle had a criminal history of her own, including a "history with drugs and alcohol." Ms. Whittle's credibility appeared in further doubt due to the condition in which she arrived at court. Based on this evidence, the motion court could rightly find that trial counsel's decision not to call her as a witness constituted reasonable trial strategy, especially when other reasonable trial strategies remained available and were pursued.

Mr. Tepikian did not remember "the circumstances related to [Mr. Whittle,]" but he recalled that both of the Whittles had credibility issues. The motion court found that Mr. Whittle was "not credible." Mr. Whittle acknowledged at least eight criminal convictions, and his sworn testimony was internally inconsistent.

The motion court did not clearly err in: (1) sharing trial counsel's belief that Mr. Whittle was not credible; (2) finding that trial counsel's decision not to call Ms. Whittle as a witness after she came to court smelling of alcohol and appearing as though she had been

22

drinking was not unreasonable; and (3) finding that trial counsel was not ineffective by choosing not to call either of them as a witness at Movant's trial.

When strategic decisions are made by defense counsel after the law and relevant facts concerning plausible options are considered, they "are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690; *Johnson*, 406 S.W.3d at 900. Point II also fails, and the denial of post-conviction relief is affirmed.

DON E. BURRELL, J. - OPINION AUTHOR

MARY W. SHEFFIELD, P.J. - CONCURS

GARY W. LYNCH, J. - CONCURS